UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

ION AUDIO, LLC,

                              Plaintiff,

              -against-

BED, BATH & BEYOND, INC.,

                              Defendant.

-------------------------------------------------------X

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/2/19

15-CV-8292 (KMW)

**OPINION AND ORDER**

KIMBA M. WOOD, United States District Judge:

      In this contract dispute, Plaintiff Ion Audio ("ION") argues that Defendant Bed, Bath &
Beyond ("BB&B") breached the sales contract between the parties. In response, BB&B disputes
that it breached the contract and counterclaims that ION is in breach.

      The parties have cross-moved for summary judgment. The Court GRANTS in part and
DENIES in part both motions for summary judgment.

                                    **BACKGROUND**

### I.    FACTUAL BACKGROUND

      The following facts are taken from the parties' Local Civil Rule 56.1 Statements and
Counter-Statements, as well as the exhibits in the record, and are not in dispute.

      BB&B is a retailer of home furnishing, kitchen equipment, and small appliances, among
other home goods. ION is a developer and seller of consumer electronics. From roughly 2007 to
2014, ION was a "seasonal" vendor to BB&B, the principal seasons being "back to school" and
"holiday."

      From 2009 onward, the contractual relationship between the parties was principally
governed by (1) BB&B's Vendor Compliance Guide, version 2009.2b, effective June 12, 2009

                                          1

(the "Guide") and (2) various addenda to the Guide that contained terms relevant to the sale of particular products during particular seasons.

In this action, ION claims that BB&B breached the terms of the Addendum to the Guide that became effective as of April 1, 2014 (the "April 2014 Addendum") by allegedly: (1) miscalculating the permitted volume rebate; (2) returning non-"A" condition merchandise for credit; (3) instituting improper payment holds; and (4) taking improper early pay discounts. ION also claims that BB&B breached the implied covenant of good faith and fair dealing.

BB&B counterclaims that ION breached various addenda by allegedly failing to pay excess damages for fiscal years 2011 through 2015.

## II. RELEVANT PROCEDURAL HISTORY

ION filed the initial complaint in this action on October 21, 2015, and filed an amended complaint on October 29, 2015. (ECF Nos. 1, 9.) On December 4, 2015, BB&B filed its answer and counterclaim. (ECF No. 17.) On December 28, 2015, ION filed its answer to BB&B's counterclaim. (ECF No. 21.) On May 12, 2017, after the discovery period ended, ION moved for partial summary judgment on all of its claims except for the claim for breach of the covenant of good faith and fair dealing. (ECF No. 66.) On the same day, BB&B moved for summary on its counterclaim for excess damages, ION's claim for the breach of the covenant of good faith and fair dealing, and for attorneys' fees. (ECF No. 69.) After the summary judgment motions were filed, ION moved to strike portions of BB&B's supporting declarations. (ECF Nos. 81, 92.)

## DISCUSSION

### I. LEGAL STANDARD

#### A. Summary Judgment

2

Summary judgment is appropriate where the moving party shows there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether there is a "genuine" dispute as to any material fact, "a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003)). The burden of showing that there is no dispute as to any material fact "lies with the party seeking summary judgment." *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "When both sides have moved for summary judgment, 'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012) (quoting *Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010)).

"In order to defeat a properly supported summary judgment motion, the opposing party must come forward with affidavits, depositions, or other sworn evidence as permitted by Fed. R. Civ. P. 56, setting forth specific facts showing there exists a genuine issue of material fact." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The nonmoving party successfully demonstrates a genuine issue of material fact if the record "is such that a reasonable jury could return a verdict for the nonmoving party." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)).

## B.    Breach of Contract

"The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de CIC et*

3

*de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000) (citing *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993)).

"Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Id.* at 157. "Ambiguity . . . is defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). "The mere assertion of ambiguity does not suffice to make an issue of fact." *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990). "[T]he court should not find the contract ambiguous where the interpretation urged by one party would 'strain[] the contract language beyond its reasonable and ordinary meaning.'" *Maverick Tube*, 595 F.3d at 467 (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (1957)).

If contractual language is objectively ambiguous, the intent of the parties "becomes an issue of fact and summary judgment is inappropriate." *Thompson*, 896 F.2d at 721.

## II. ION'S CLAIMS

Ion moves for summary judgment on four claims: (1) miscalculation of the permitted volume rebate; (2) improper return credit for non-"A" condition merchandise; (3) improper payment holds; and (4) improper early pay discounts. BB&B cross-moves for summary judgment on all of these claims.

### A. Alleged Improper Volume Rebate

ION moves for summary judgment on its claim that BB&B breached the April 2014 Addendum by miscalculating the volume rebate in two ways. (ECF No. 67, at 17–18.) First, ION argues that BB&B calculated its net purchases based on the 2014 *calendar* year, whereas

4

the April 2014 Addendum requires BB&B to calculate its net purchases based on the 2014 *fiscal*

year. (*Id.*) Section 7 of the April 2014 Addendum states:

> The Volume Rebate shall be calculated based on net
> purchases during BB&B's fiscal year 2014. The start and
> end amounts shall include all purchases of all products by
> BB&B from ION Audio during the 2014 fiscal year, and
> shall not be limited to purchases for the Holiday Program.

(ECF No. 68, Ex. 2, at 3.) Second, ION argues that BB&B failed to apply the graduated, tiered

percentages to its net purchases as required by the April 2014 Addendum and instead applied a

flat rate of two percent to the entirety of its net purchases. (ECF No. 67, at 17–18.) Section 7 of

the 2014 Addendum states that BB&B is entitled to the following volume rebate:

| Rebate % | Tier Start Amount | Tier End Amount |
|----------|-------------------|-----------------|
| 1% | $0 | $3,000,000 |
| 1.5% | $3,000,001 | $3,500,000 |
| 2% | $3,500,001 | $4,000,000 |
| 2.5% | $4,000,001 | $no limit |

(ECF No. 68, Ex. 2, at 2.)

In response, BB&B principally argues that the April 2014 Addendum does not control the

computation of the volume rebate. (ECF No. 87, at 16–17.) Rather, BB&B contends that a July

2014 email exchange between the parties modified the terms by which the volume rebate was to

be calculated. (*Id.*) BB&B's July 2014 email to ION states:

> 23529-24801 Volume Allowance Chargeback Finance Annually
> 1/1/2014 12/31/14 Back to Zero $0 $3,000,000 1%

23529-24801 Volume Allowance Chargeback Finance Annually

1/1/2014 12/31/14 Back to Zero $3,000,001 $3,500,000 1.5%

23529-24801 Volume Allowance Chargeback Finance Annually
1/1/2014 12/31/14 Back to Zero $3,500,001 $4,000,000 2%

23529-24801 Volume Allowance Chargeback Finance Annually
1/1/2014 12/31/14 Back to Zero $4,00,001 2.5%

(ECF No. 68, Ex. 3-1, at 26.) ION responded with an email that stated "confirmed." (*Id.*)

BB&B therefore cross-moves for summary judgment, arguing that it was permitted to calculate

its net purchases based on the calendar year and apply the two percent rebate to the entirety of its

net purchases.

### 1. The July 2014 email exchange controls

This Court disagrees with ION that the April 2014 Addendum controls, because the July

2014 email exchange between the parties modified the terms by which BB&B was to calculate

the volume rebate. Section 9 of the April 2014 Addendum states that the Addendum controls in

the event of conflict with any other transactional documents:

> In the event that any of the terms and conditions of this
> Addendum conflict with any of the terms and conditions of
> the Guide or any printed terms and conditions of any
> transactional document exchanged by the parties, the terms
> and conditions of this Addendum shall govern. All terms
> and conditions of the Guide not expressly amended or
> affected by this Addendum shall remain the same.

(ECF No. 68, Ex. 2, at 3.) Although there is an apparent conflict between Section 7 of the

Addendum and the July 2014 email exchange, Section 9 does not resolve whether the July 2014

email exchange *modified* Section 7.

Section 8 of the April 2014 Addendum establishes the process for subsequent

amendments to or modifications of the Addendum:

> No amendments or additions to this Addendum or the Guide
> shall be binding unless in writing and signed by both parties

6

hereto. No provision of this Addendum may be modified, waived, or discharged, unless such waiver, modification or discharge is agreed to in writing and signed by both Parties.

(*Id.*) Under Section 8, the question is whether the July 2014 email exchange constitutes a modification in writing signed by both parties. The emails were plainly in writing, and each email concluded with a signature block, containing the typed name and title of the representative from BB&B and ION. (ECF No. 68, Ex. 3-1, at 26.) The July 2014 email exchange was thus sufficient to modify the April 2014 Addendum. *See Stevens v. Publicis, S.A.*, 854 N.Y.S.2d 690, 692 (2008) ("The e-mails from plaintiff constitute 'signed writings' within the meaning of the statute of frauds, since plaintiff's name at the end of his e-mail signified his intent to authenticate the contents. Similarly, [defendant's] name at the end of his e-mail constituted a 'signed writing' and satisfied the requirement of [the contract] that any modification be signed by all parties.") (internal citation omitted). Therefore, the volume rebate terms contained in BB&B's July 2014 email control.

## 2. The July 2014 email is unambiguous

Given that the July 2014 email governs the permitted volume rebate, the next question is whether the terms contained therein are unambiguous. This Court concludes that they are. The July 2014 email repeatedly states, "Volume Allowance . . . Annually 1/1/2014 12/31/14," which plainly provides for a calculation based on the *calendar* year. (ECF No. 68, Ex. 3-1, at 26.) The July 2014 also states, "Volume Allowance . . . Back to Zero 3,500,001 4,000,000 2%," which makes clear that BB&B is entitled to a two percent rebate where its net purchases are between $3,500,001 and $4,000,000. (*Id.*)

## 3. Summary judgment is warranted as to the volume rebate claim

7

ION does not dispute that BB&B calculated its volume rebate based on the calendar year. Similarly, ION does not dispute that BB&B took a two percent rebate on its net purchases, which were between $3,500,001 and $4,000,000. Because the contract is unambiguous, and there is no dispute as to any material fact, the Court grants summary judgment in favor of BB&B as to ION's volume rebate claim. ION's motion for summary judgment on this claim is denied.

## B. Alleged Improper Credits For "A" Condition Merchandise

ION moves for summary judgment on its claim that BB&B breached the April 2014 Addendum by taking credits for returns of products that were not "A" condition. (ECF No. 67, at 19–20.) Section 5(b) of the 2014 Addendum states under what circumstances BB&B is permitted to take a return credit:

> BB&B will do returns at the end of the 2014 Back to School selling season. For the Rock Speaker Bluetooth the return will occur after 7/4/2014. A written RA [Return Authorization] will be required and ION Audio will only give credit on only "A" condition product in packaging. For the Sound Lounge and House Party the return will occur after 9/1/2014. A written RA will be required and ION Audio will only give credit on only on "A" condition product in packaging. Any product that is damaged, out of package or [in] damaged packaging will not receive credit.

(ECF No. 68, Ex. 2, at 2.) ION also contends that BB&B took credit for merchandise BB&B never even returned. (ECF No. 67, at 19–20.)

In response, BB&B argues that Section 5(b) of the April 2014 Addendum was superseded by a subsequent June 2014 Product Return Agreement ("PRA"), which refers only to the Guide and is silent as to the "A" condition requirement. (ECF No. 71, at 10–11). The PRA states, in relevant part:

> Be reminded that this Product Return Agreement is in addition to, and not in lieu of, the BBB Vendor Compliance Guide, and such Vendor Compliance Guide remains in full

> force and effect. You, the vendor[,] are responsible for
> freight as indicated above and agree to waive any restocking
> or re-ticketing charges. Vendor must inform BBB of any
> special packaging requirements needed to ensure returns are
> received back in acceptable condition.

(ECF No. 72, Ex. M, at 2.) BB&B contends that, because the PRA does not mention the "A"
condition requirement contained in Section 5(b), that requirement no longer applies. BB&B
moves for summary judgment on this basis.[1]

Even if Section 5(b) controls, BB&B contends it is nonetheless entitled to summary
judgment because ION cannot prove the merchandise ION received from BB&B failed to meet
the "A" condition requirement. (ECF No. 87, at 10–12; ECF No. 71, at 11–14.) BB&B argues
that Robert Griffith, ION's Manager of Technical Support and Return Authorizations, is not
competent to testify as to the condition of returned merchandise, which is catalogued in business
records ION provided, because Griffith's personal knowledge is based on hearsay. (ECF No. 71,
at 11.) Specifically, BB&B asserts that Griffith's testimony related to ION's business records
should be excluded because Griffith "made no first-hand observation or inspection of those
goods," did not "count[] the returns himself," and did not "know[] who inspected the goods."
(*Id.* at 14.) Therefore, BB&B argues that ION cannot introduce its business records through
Griffith, and because he is the only witness designated to testify as to the condition of the
returned merchandise, ION cannot prove the quantity of non-"A" condition merchandise BB&B
returned. (*Id.*)[2]

---

[1] BB&B also argues that ION's claim under Section 5(b) of the April 2014 Addendum is somehow extinguished
because ION once offered to resolve the dispute through a $2.50 "box replacement fee" and reimbursement for scrap
product. (ECF No. 87, at 12; ECF No. 68, Ex. 3-2, at 33.) BB&B advances this argument despite the fact that
BB&B apparently never even responded to the offer. Alternatively, BB&B contends that ION's offer to resolve the
dispute, which included a request for $27,680.25, is an admission of the extent of ION's damages. (*Id.*) These
arguments are absurd, and the Court rejects them.

[2] BB&B makes a similar argument with respect to pictures that allegedly demonstrate the condition of the
merchandise returned to ION. The Court defers ruling on this argument at this time.

9

### 1. Section 5(b) controls

This Court disagrees with BB&B that the PRA superseded Section 5(b) of the April 2014 Addendum. First, the PRA does not purport to amend or modify the "A" condition requirement of Section 5(b). In fact, the PRA does not contain any reference whatsoever to the condition merchandise must be in to receive return credit. Second, the PRA plainly states that its terms are *in addition to and not in lieu of* the Guide, which itself was modified by the April 2014 Addendum. Third, if the PRA entirely displaced Section 5(b), BB&B would apparently be permitted to return merchandise to ION for credit *regardless* of the condition of the merchandise—that is, BB&B could return broken products or products missing parts and receive full credit. This interpretation is commercially unreasonable. *See Greenwich Capital Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (1st Dep't 2010) ("Put otherwise, a contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties."). For the above reasons, the Court concludes that Section 5(b) of the April 2014 Addendum remains in force. [3]

### 2. Section 5(b) is unambiguous

Given that Section 5(b) governs what merchandise was returnable for credit, the next question is whether the terms contained therein are unambiguous. The Court concludes that they are. Section 5(b) states, "only 'A' condition product" will receive return credit." (ECF No. 68, Ex. 2, at 2.) As to what constitutes "A" condition product, Section 5(b) states, "[a]ny product that is damaged, out of package or [in] damaged packaging will not receive credit." (*Id.* at 2.)

---

[3] Even assuming the PRA did supersede Section 5(b), the PRA provides that "[v]endor must inform BBB of any special packaging requirements needed to ensure returns are received back in acceptable condition." This is precisely what Section 5(b) does, stating that any product "out of package or [in] damaged packaging will not receive credit."

10

BB&B was thus not entitled to receive return credit for damaged products, products out of their packaging, or products in damaged packaging.

### 3. ION's business records are admissible under Federal Rule of Evidence 803(6)

ION is permitted to introduce its business records under Federal Rule of Evidence 803(6), which excepts records of regular business activity from the rules prohibiting hearsay. *See Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 421 (S.D.N.Y. 2011) (Wood, J.) ("The business records exception [is] construed generously in favor of admissibility, due to the general trustworthiness of regularly kept records and the need for this type of evidence in many cases.") "To lay a proper foundation for a business record, a custodian or other qualified witness must testify that the document was 'kept in the course of regularly conducted business activity and also that it was the regular practice of that business activity to make the [record].'" *United States v. Komasa*, 767 F.3d 151, 156 (2d Cir. 2014) (quoting *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (alteration in *Williams*)). "The custodian need not have personal knowledge of the actual creation of the document." *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 101 (2d Cir. 1995) (quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence § 803 (1994)). Griffith does not need to have observed or counted the merchandise himself to lay a proper foundation for ION's business records, which serve as evidence of the condition in which BB&B returned merchandise to ION. Therefore, the Court disagrees with BB&B that ION's claim suffers from a failure of proof.

### 4. Partial summary judgment is warranted as to "A" condition return credit

The Court holds that Section 5(b) of the April 2014 Addendum remains in force and that its terms unambiguously state that BB&B will receive return credit only for merchandise in "A"

11

condition—that is, BB&B will *not* receive credit for products that are damaged, out of package, or in damaged packaging. The Court grants partial summary judgment to ION to this extent. The Court denies BB&B's motion for summary judgment as to ION's return credit claim.

There remains a genuine dispute as to the exact quantity of products BB&B returned for credit that were not in "A" condition. In response to ION's business records, BB&B points to the deposition of Griffith, who testified that the definition of 'A' condition at ION "comes down to what is acceptable by the customer as a new product. Pretty common sense definition." (ECF No. 71, at 11; *Id.*, Ex. 3, at 37:19–37:21.) BB&B questions whether the ION employees responsible for categorizing the condition of returned merchandise did so properly. BB&B also highlights that ION's own reporting of the quantity of "A" condition merchandise received from BB&B was inconsistent. (ECF No. 87, at 10; *compare* ECF No. 68, Ex. 3-2, at 33 *with* ECF No. 68, Ex. 5.) This question of fact, as well as the attendant question of damages, is reserved for trial.

## C. Alleged Improper Payment Holds

ION moves for summary judgment on its claim that BB&B improperly withheld payments under the April 2014 Addendum. (ECF No. 67, at 14–16.) Section 6 of that Addendum provides:

> [T]he parties agree that BB&B, in its sole and absolute discretion, may "hold" up to $150,00 in payables otherwise due and owing for the second shipment of merchandise. In the event BB&B elects to implement this hold, it shall advi[s]e ION Audio[,] in writing, of the dollar amount of the hold and the invoices subject to the hold.

(ECF No. 68, Ex. 2, at 2.) ION claims that BB&B instituted a payment hold of approximately $1.2 million in October 2014, reduced the hold to $750,000 in December 2014, and finally lifted the hold in May 2015. (ECF No. 67, at 14). As a result of this payment hold, ION argues that

12

BB&B violated Section 6 because: (1) the amount of the hold far exceeded $150,000; (2) the hold was not limited to the second shipment; and (3) BB&B never advised ION in writing of the dollar amount of the hold or the invoices subject to the hold. (*Id.*)

Although BB&B acknowledges that it instituted a payment hold of $1.2 million, BB&B disputes ION's reading of Section 6 of the Addendum and argues that the terms of the Guide allow BB&B to institute a payment hold of $1.2 million, without notifying ION of the amount of the hold or the invoices subject to the hold. (ECF No. 87, at 13–15.) Section 13 of Appendix C to the Guide states:

> BB&B may also, in its sole discretion, place a temporary hold on amounts due Vendor in an amount equal to the actual/estimated value of any allowance or rebate negotiated by the parties . . . .

(ECF No. 68, Ex. 1-2, at 11.) BB&B contends that, under the Guide, it has the right to assert a payment hold as long as the amount of the hold equals "the actual/estimated value of any allowance or rebate negotiated by the parties." (ECF No. 87, at 13.) BB&B argues that this term can be read consistently with the payment hold in Section 6 of the 2014 Addendum. (*Id.* at 14.) According to BB&B, Section 13 limits the hold based on the amount of allowance or rebate it anticipates receiving from ION, whereas Section 6 allows BB&B to withhold up to $150,000 on the second shipment regardless of any anticipated allowance or rebate. (*Id.*) In BB&B's view, the two types of holds—rather than being in conflict—constitute two different mechanisms for instituting separate types of payment holds. (*Id.*)

BB&B contends that, even if the 2014 Addendum displaces the Guide, it does so only with respect to "the second shipment." (*Id.* at 15.) If that is correct, the Guide would still be in force with respect to the first and third anticipated shipments under the 2014 Addendum, allowing BB&B to institute the payment hold of $1.2 million.

13

## 1.  Section 6 is ambiguous

The Court concludes Section 6 is ambiguous because it is not clear to what extent the payment hold terms of Section 6 supersede the payment hold terms of the Guide, if they do so at all. As a consequence of this ambiguity, Section 6 is susceptible to at least three reasonable interpretations.

First, the payment hold terms of Section 6 could be read to supersede *all* the payment hold terms of the Guide. Under this reading, which ION urges, the *only* payment hold BB&B is permitted is the hold described in Section 6. This interpretation depends on Section 9 of the April 2014 Addendum, which, as explained above, provides that the Addendum controls in the event of "conflict" with the Guide.

Second, the payment hold terms of Section 6 could be read to supersede *none* of the payment hold terms in the Guide. Under this reading, which BB&B urges, Section 6 allows BB&B to withhold up to $150,000 *for any reason*. Separately, the Guide allows BB&B to withhold any amount *as long as* the amount of the hold is equal to the actual or estimated value of any allowance or rebate owed to BB&B. Because Section 6 of the April 2014 Addendum and Section 13 of Appendix C to the Guide do not conflict under this interpretation, Section 9 of the Addendum would be inapplicable.

Third, the payment hold terms of Section 6 could be read to supersede the payment hold terms of the Guide only with respect to the second shipment. Pursuant to this reading, with respect to the second shipment, BB&B would be permitted to withhold only $150,000 and, if it did so, would be required to notify ION in writing of the amount of the hold and the invoices at issue. For holds on *other* shipments, however, the Guide would control, allowing BB&B to institute a payment hold as long as the amount of the hold did not exceed the actual or estimated

14

value of any allowance or rebate owed to BB&B. Under this interpretation, Section 9 of the April 2014 Addendum supplants Section 13 of Appendix C to the Guide with respect to the second shipment only. Otherwise, Section 13 of Appendix C controls.

Because of this contract ambiguity, the intent of the parties becomes an issue of fact and summary judgment is inappropriate. *Thompson*, 896 F.2d at 721. Therefore, ION's and BB&B's motions for summary judgment are denied as to the payment hold issue.

## D. Alleged Improper Early Pay Discounts

ION moves for summary judgment on its claim that BB&B breached Section 4 of the April 2014 Addendum by taking early pay discounts for which BB&B did not qualify. (ECF No. 67, at 16–17.) Section 4 establishes a two percent early pay discount in the event that BB&B pays an invoice within "net thirty (30) days." (ECF No. 68, Ex. 2, at 2.) Ion alleges BB&B took early pay discounts on invoices paid after the thirty-day period had passed.

Although BB&B acknowledges that it took early pay discounts on invoices paid after the thirty-day period ended, BB&B argues that a payment hold "stops the clock" on the thirty-day window. (ECF No. 87, at 17–18.) BB&B contends that "[i]t would be contradictory for [BB&B] to have no obligation to pay any amount because a payment hold was in place, yet still have an obligation to pay within 30 days to preserve the 2% discount." (*Id.* at 17.) BB&B also points out that the June 2014 PRA states, "[a]ll applicable trade discounts will be in force during th[e] period [of a hold]." (ECF No. 87, at 18; No. 72, Ex. M, at 2.) Because BB&B took early pay discounts on invoices paid within thirty days of lifting a payment hold, BB&B contends it is entitled to summary judgment on this claim.

In response, ION contends that BB&B's interpretation would effectively eliminate the thirty-day requirement because BB&B could simply time the release of any payment hold until

15

BB&B was prepared to pay the invoice. (ECF No. 67, at 16.) There would thus be no incentive for BB&B to pay within the thirty-day timeframe.

## 1. Section 4 is ambiguous

Although Section 4 unambiguously states that BB&B is entitled to an early pay discount if BB&B pays an invoice within thirty days, Section 4 also states that its terms are "subject to Section 6," which contains the payment hold contract language. (ECF No. 68, Ex. 2, at 2.) The "subject to" language suggests that a payment hold affects—at least in some way—the provision of an early pay discount. But the manner in which the early pay discount terms of Section 4 are "subject to" the payment hold terms of Section 6 is not clear from the contract language. For example, rather than stopping the clock on the thirty-day window, "subject to Section 6" could mean that the early pay discount remains available up to the point BB&B lifts the hold but no longer—that is, BB&B would be required to pay the invoices before—or at the same time as—it lifts the hold to be entitled to the early pay discount. Moreover, because Section 6 is itself ambiguous, as explained above, the meaning of "subject to Section 6" is even less clear.

Because of these contractual ambiguities, the intent of the parties becomes an issue of fact and summary judgment is inappropriate. *Thompson*, 896 F.2d at 721. The Court therefore denies the parties' cross-motions for summary judgment as to ION's early pay claim.

## III. BB&B'S CLAIMS

BB&B moves for summary judgment on (1) its counterclaim for excess damages under various addenda; (2) ION's claim for breach of the implied covenant of good faith and fair dealing; and (3) for attorneys' fees. ION has also moved for summary judgment in its favor on these claims.

### A. Alleged Excess Damages

16

BB&B claims that ION owes BB&B excess damages that have accrued from fiscal years 2011 through 2015. (ECF No. 71, at 6.) The addendum for each annual contract at issue provided, in relevant part:

> For damaged or defective items, in lieu of returns, the parties agree to a damage allowance of two percent (2%) off each invoice, to be taken by BB&B as a deduction against invoices when remitting payment to ION Audio. This allowance shall be calculated based on gross receipts and shall include inbound freight. After the end of the 2014 program for BB&B, damages/defectives shall be reconciled, and if damages/defectives exceed 2% of gross receipts, ION Audio shall pay any such excess to BB&B within 10 business days of written notice of any such excess amount due.

(ECF No. 78, Ex. A, at 2.) Each addendum contained the same language with only the program year changed. Under the above provision, "excess damages" are equivalent to the total damages (with freight), less the amount deducted during each fiscal year as the damage allowance. Acknowledging that it sometimes presented its claims for excess damages months, or even years, after the relevant fiscal year ended, BB&B argues that the addenda "set[] no limit on when Bed Bath & Beyond is to notify Ion Audio of a charge for excess damages." (ECF No. 71, at 7.) BB&B thus claims there is "no time limit, apart from the statute of limitations, on BB&B's right to recover excess damages." (ECF No. 95, at 6.)

In response, ION advances two principal arguments in support of its motion for summary judgment on BB&B's excess damages claim. First, ION argues that, because the addenda did not supply a time limitation for BB&B to notify ION of claims for excess damages, U.C.C. § 2-309 controls, requiring BB&B to notify ION within a reasonable time. (ECF No. 77, at 7.) ION contends BB&B failed to notify ION within a reasonable time of the claims for excess damages, and thus BB&B is not entitled to recover excess damages. (*Id.*)

Second, ION asserts equitable estoppel, arguing that "the alleged excess damages constituted critical information that BB&B did not share historically with ION, even while the parties negotiated the price and volume terms of each separate, subsequent program." (ECF No. 67, at 21.) ION contends that it detrimentally relied on BB&B's silence as to excess damages—thereby assuming the actual damages were less than the two percent allowable deduction—when negotiating the terms of subsequent contracts with BB&B. (ECF No. 67, at 24.) Had it known of the excess damages BB&B would eventually claim, ION alleges it would not have entered into the subsequent contracts under the same terms. (*Id.*)[4]

## 1. U.C.C. § 2-309 controls and precludes summary judgment

BB&B is correct that the annual addenda do not set a time limit on when BB&B must notify ION of a charge for excess damages. Accordingly, under New York's U.C.C. § 2-309(1), the Court can imply the time term into the contract. *See Jafari v. Wally Findlay Galleries*, 741 F. Supp. 64, 67 (S.D.N.Y. 1990) (Sweet, J.) ("Although this contract did not specify the payment and delivery dates, we can imply the time term into the contract."); *see also Hessel v. Christie's Inc.*, 399 F. Supp. 2d 506, 518 (S.D.N.Y. 2005) (Marrero, J.) ("Even if [the plaintiff] were correct that the parties' agreement contained no term for time of payment, the court may imply a time term into the contract."). New York's U.C.C. § 2-309(1) provides, in relevant part, that "[t]he time for shipment or delivery or any other action under a contract if not . . . agreed upon

---

[4] ION also argues that there are genuine disputes of material fact as to whether the merchandise BB&B classified as damaged or defective—and therefore eligible for a chargeback from ION—was properly classified. (ECF No. 95, at 9–10.) According to ION, BB&B classified merchandise as damaged or defective based on of customer dissatisfaction or poor sales. (*Id.*) ION contends that, without records as to the basis of the dissatisfaction or poor sales, both of which could have nothing to do with damaged or defective products, BB&B has not shown BB&B is entitled to the excess damages claimed. The Court does not reach this argument because, as explained below, application of U.C.C. § 2-309 and ION's defense of equitable estoppel are sufficient to preclude summary judgment on this claim.

18

shall be a reasonable time."[5] BB&B was thus required to notify ION of charges for excess damages, if any, within a reasonable time.

This determination, however, does not entitle ION to summary judgment, because "[w]hat constitutes a reasonable time is a question of fact for the jury." *Gillespie v. St. Regis Residence Club*, 343 F. Supp. 3d 332, 348 (S.D.N.Y. 2018) (Woods, J.); *see also Lituchy v. Guinan Lithographic Co. Inc.*, 400 N.Y.S.2d 158, 159 (2d Dep't 1977) ("[T]he question as to what constitutes a reasonable time for performance under the circumstances presented here is a factual one requiring trial.")

The disputes of material fact related to the question of reasonableness as to time include, for example, when was the earliest time BB&B could have provided the excess damages calculations to ION. ION alleges BB&B maintained "contemporaneous records" as to the quantity of damaged and defective products, and therefore could have provided the excess damage claim at the conclusion of each fiscal year. (EFC No. 90, at 9.) BB&B alleges that the excess damage calculations were not prepared until months after the end of each fiscal year. (ECF No. 87, at 8.)

The question of whether BB&B notified ION of the charges for excess damages within a reasonable time is thus reserved for trial.

## 2. Equitable estoppel is inappropriate for resolution on summary judgment

Equitable estoppel requires a showing of "(1) [a]n act constituting a concealment of facts or a false misrepresentation; (2) [a]n intention or expectation that such acts will be relied upon;

---

[5] U.C.C. § 1-204(2) provides that "a reasonable time . . depends on the nature, purpose, and circumstances" of the contract. *See also Ben Zev v. Merman*, 73 N.Y.2d 781, 783 (1988) (explaining that reasonableness is determined by "the nature and object of the contract, the previous conduct of the parties, the presence or absence of good faith, the experience of the parties and the possibility of prejudice or hardship to either one").

19

(3) [a]ctual or constructive knowledge of the true facts by the wrongdoers; (4) [r]eliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment." *Gen. Elec. Capital Corp. v. Armadora, S.A.*, 37 F.3d 41, 45 (2d Cir. 1994).

"Whether equitable estoppel applies in a given case is ultimately a question of fact." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001) (citing *Bennett v. United States Lines, Inc.*, 64 F.3d 62, 65 (2d Cir.1995)); *see also Dunlop-McCullen v. Pascarella*, No. 97 CV 195 (PKL), 2002 WL 31521012, *15 (S.DN.Y. Nov. 13, 2002) (Leisure, J.) ("Estoppel is usually a question of fact inappropriate for summary judgment." (citing *Amrep Corp. v. Amer. Home Assurance Co.*, 440 N.Y.S.2d 244, 247 (1st Dep't 1981))). There is no reason to depart from this general rule in the present case. Each of the elements of ION's defense of equitable estoppel involve disputed issues of material fact that cannot be resolved on the parties' cross-motions for summary judgment. The Court therefore denies both ION's and BB&B's motions for summary judgment with respect to the defense of equitable estoppel.

**B.  Alleged Breach of the Implied Covenant of Good Faith and Fair Dealing**

BB&B moves to dismiss ION's claim for breach of the implied covenant of good faith and fair dealing because it is duplicative of ION's breach of contract claims. (ECF No. 71, at 15–16.) In response, ION argues that its claim for breach of the implied covenant of good faith and fair dealing is based on separate factual allegations and therefore is not duplicative. (ECF No. 77, at 15–16.)

"New York law implies a covenant of good faith and fair dealing 'pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Fellows v. CitiMortgage, Inc.*, 710 F. Supp. 2d 385, 407 (S.D.N.Y. 2010) (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d

20

400, 407 (2d Cir. 2006)). However, "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) (omission in *Cruz*)). Therefore, where claims for breach of contract and breach of the implied covenant are both pled, the implied covenant claim can survive dismissal "only 'if it is based on allegations different than those underlying the accompanying breach of contract claim' and if the relief sought is not 'intrinsically tied to the damages allegedly resulting from the breach of contract.'" *Rojas v. Don King Prods., Inc.*, No. 11–CV–8468 (KBF), 2012 WL 760336, at *3 (S.D.N.Y. Mar. 6, 2012) (Forrest, J.) (quoting *In re Refco Inc. Sec. Litig.*, 826 F.Supp.2d 478, 496 (S.D.N.Y. 2011) (Rakoff, J.))

In this case, ION's implied covenant claim duplicates its breach of contract claim. In its complaint, ION alleges that BB&B breached the contract by: "[1] [m]aintaining a payment 'temporary hold' in an amount greater than agreed and for a duration longer than agreed; [2] [f]ailing to pay ION amounts improperly credited as volume rebates; [3] [f]ailing to pay ION amounts improperly credited as early pay discounts; [4] [f]ailing to pay ION amounts improperly credited for returns it never made, for product return amounts it was never invoiced and/or for non-'A' condition returns not entitled to credit." (ECF No. 9, at ¶ 45.) With respect to the implied covenant claim, the complaint restates the same allegations as the breach of contract claim, adding only that BB&B "conceal[ed] material information, deliberately miscalculat[ed] set formulas and misrepresent[ed] facts." (*Id.* at ¶¶ 47–51.) Although ION argues that the implied covenant claim is based on conduct that occurred after the breach of contract, (*see* ECF No. 71, at 16), there is no meaningful distinction between the facts underlying each claim.

21

Even if the factual predicate for the implied covenant claim were distinct from that of the breach of contract claim, the relief ION seeks is nevertheless "intrinsically tied to the damages resulting from the breach of contract." *Rojas*, 2012 WL 760336, at *3. ION's disclosure of its damages, made pursuant to Federal Rule of Civil Procedure 26(a), states that, as a result of BB&B's breach of the implied covenant of good faith and fair dealing, BB&B owes ION an amount totaling approximately $522,000, consisting of "BB&B's implementation of the improper 'holds' ($38,400), miscalculation of the 'volume rebate' ($41,121), improper taking of 'early pay' discounts for invoices paid after thirty days had passed ($40,625), and from BB&B claiming credits for returns that either never existed or did not satisfy the contractual requirement that all returns come in A-stock condition in original packaging ($402,691)." (ECF No. 72, Ex. N, at 3.) These damages all flow from, and are identical to the damages sought for, ION's breach of contract claim. (*Id.*)

Because ION's implied covenant claim is duplicative of its breach of contract claim, the Court grants BB&B's motion for summary judgment on the implied covenant claim.

## C. Recovery of Attorneys' Fees

BB&B moves for recovery of attorneys' fees pursuant to the following provision of the Guide:

> Vendor agrees that, in the event of litigation between BB&B and Vencor with respect to Merchandise, BB&B shall be entitled to recover reasonable attorneys' fees in the event it is the prevailing party on any claim or defense.

(ECF No. 78, Ex. G, at 27–28.) The Court declines to consider any application for fees at this juncture. BB&B's motion for summary judgment as to attorneys' fees is thus denied as premature. BB&B may renew its motion for attorneys' fees at the conclusion of this action.

## IV. ION'S MOTIONS TO STRIKE

22

In connection with the cross-motions for summary judgment, ION moves to strike portions of the supporting declarations of Christine Caroleo and David Denenberg. (ECF Nos. 81, 95.) Because the Court did not rely on the portions of the declarations subject to ION's motions to strike, the Court denies both motions as moot.

## CONCLUSION

ION's motion for partial summary judgment is DENIED with respect to its claim for improper volume rebates. BB&B's cross-motion for summary judgment on this claim is GRANTED.

ION's motion for partial summary judgment is GRANTED on its claim for improper "A" condition return credit. BB&B's cross-motion for summary judgment on ION's claim for improper return credit is DENIED.

ION's and BB&B's cross-motions for summary judgment with respect to claims for improper payment holds, improper early pay discounts, and excess damages are DENIED.

BB&B's motion for summary judgment is GRANTED on ION's claim for breach of the implied covenant of good faith and fair dealing.

BB&B's motion for summary judgment on recovery on attorneys' fees is DENIED as premature. The denial is without prejudice to a future motion for attorneys' fees.

ION's motions to strike are DENIED as moot.

The Clerk of Court is directed to terminate the motions at ECF Nos. 66, 69, 81, and 92.

The parties shall, by April 12, 2019, submit to the Court a joint letter outlining the steps that need to be taken before this case is Ready for Trial. The parties must file a joint pretrial order by June 3, 2019. By that date, the parties shall also advise the Court whether they consent

23

to trial of this case before a Magistrate Judge. The case will be deemed Ready for Trial on June

10, 2019. Counsel are directed to comply with this Court's Individual Rules.

SO ORDERED.

Dated: New York, New York
April 2, 2019

*Kimba M. Wood*

KIMBA M. WOOD
United States District Judge